IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FIFTH DISTRICT

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

DANTE MARTIN,

   Appellant,

 v.             Case No.  5D15-284

STATE OF FLORIDA,

   Appellee.

_____/

Opinion filed November 18, 2016

Appeal from the Circuit Court
for Orange County,
Renee A. Roche, Judge.

Rupak R. Shah and Frances E. Martinez, of
Escobar & Assoc., P.A., Tampa, for
Appellant.

Pamela Jo Bondi, Attorney General,
Tallahassee, and Samuel A. Perrone and
Bonnie Jean Parrish, Assistant Attorney
Generals, Daytona Beach, for Appellee.


PALMER, J.

   Dante Martin (the defendant) appeals his judgment and sentences, which were

entered by the trial court after a jury found him guilty of committing the crimes of

manslaughter,[1] felony hazing resulting in death,[2] and two counts of misdemeanor hazing.[3] We affirm.

The defendant was a member of the percussion section of the Florida A&M University's marching band, the "Marching 100." Members of the percussion section are entitled to ride to away events in a motor coach known as "Bus C." The defendant was president of Bus C.

A tradition or ritual known as "Crossing Bus C" has existed at the University for some time. The ritual consists of three components: 1) the hot seat, 2) the prepping, and 3) the crossing. During the hot seat, the participant takes a seat on Bus C (near the front) and is struck or hit repeatedly by others, including members of the percussion section. Next, the participant is prepped. During the prepping, the participant stands up and places his or her hands on the luggage rail and is then slapped a number of times with full force by the others on the bus. After the prepping, the participant crosses from the front of the bus to the back while others slap, kick, and punch the participant. The defendant, as bus president, decided when someone could cross Bus C.

On the day at issue, Keon Hollis, Robert Champion, and the defendant, as members of the Marching 100, performed at the Florida Classic in Orlando, Florida. Immediately following the band's performance, the defendant asked Hollis if he planned to cross the bus. Hollis indicated that he wanted to do so. Later, Jonathan Boyce, also a member of the band, received a text from the defendant asking him to convey to Hollis and Champion that if they wanted to cross "it's available" to them.

---

[1] § 782.07, Fla. Stat. (2012).
[2] § 1006.63(2), Fla. Stat. (2012).
[3] § 1006.63(3), Fla. Stat. (2012).

That night, Lissette Sanchez (another member of the percussion section), Hollis, and Champion crossed Bus C, and the defendant participated in these crossings. Champion was the last to cross. When Champion made it to the back, he appeared tired, but indicated, "I'm good." After the crossings were completed, everyone left the bus except Champion. When Boyce noticed that Champion was not with him, he returned to the bus. He found Champion in the back of the bus panicking; and, shortly thereafter, Champion passed out. Champion was taken to a hospital, but efforts to save his life were not successful.

Champion's body was transferred from the hospital to the medical examiner's office. Dr. Sarah Irrgang, the associate medical examiner, visually examined Champion's body. She observed some discoloration and a few superficial abrasions, she took several photographs, and then released Champion's body for bone harvesting. The next day, after his leg bones had been harvested, Champion's body was returned to the medical examiner's office. At that time, Dr. Irrgang noticed unevenness in the skin on Champion's torso, suggesting swelling. This observation prompted Dr. Irrgang to investigate further. She took a number of pictures of Champion's body during the ensuing autopsy. Based on her investigation, she determined that the manner of death was homicide.

The defendant was later arrested and charged with manslaughter, felony hazing resulting in death, and two counts of misdemeanor hazing. The matter proceeded to a jury trial, which resulted in guilty verdicts on all counts. The trial court entered judgment in accordance with the verdicts and sentenced the defendant to a term of seventy-seven months' imprisonment. This appeal followed.

The defendant first argues that his three hazing convictions must be reversed because Florida's hazing statute is unconstitutionally overbroad and vague. We disagree.

A trial court's decision regarding the constitutionality of a statue is reviewed de novo. State v. Catalano, 104 So. 3d 1069, 1075 (Fla. 2012). When addressing constitutional challenges to statutes based on the doctrines of overbreadth and vagueness,

> [a] court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct. If it does not, then the overbreadth challenge must fail. The court should then examine the facial vagueness challenge and, assuming the enactment implicates no constitutionally protected conduct, should uphold the challenge only if the enactment is impermissibly vague in all of its applications. A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others. A court should therefore examine the complainant's conduct before analyzing other hypothetical applications of the law.

State v. Kahles, 644 So. 2d 512, 512–13 (Fla. 4th DCA 1994) (quoting Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 494–95 (1982)), approved, 657 So. 2d 897 (Fla. 1995) (footnotes omitted).

Florida's hazing statute defines the term hazing, provides examples of hazing, and provides a list of activities or conduct excepted from the definition of hazing:

**1006.63. Hazing Prohibited**:

(1) As used in this section, "hazing" means any action or situation that recklessly or intentionally endangers the mental or physical health or safety of a student for purposes including, but not limited to, initiation or admission into or affiliation with any organization operating under the sanction of a postsecondary institution. "Hazing" includes, but is not limited to, pressuring or coercing the student into violating state or federal law, any brutality of a physical nature, such as whipping, beating, branding, exposure to the elements, forced

4

consumption of any food, liquor, drug, or other substance, or other forced physical activity that could adversely affect the physical health or safety of the student, and also includes any activity that would subject the student to extreme mental stress, such as sleep deprivation, forced exclusion from social contact, forced conduct that could result in extreme embarrassment, or other forced activity that could adversely affect the mental health or dignity of the student. Hazing does not include customary athletic events or other similar contests or competitions or any activity or conduct that furthers a legal and legitimate objective.

. . . .

(5) It is not a defense to a charge of hazing that:

(a) The consent of the victim had been obtained;
(b) The conduct or activity that resulted in the death or injury of a person was not part of an official organizational event or was not otherwise sanctioned or approved by the organization; or
(c) The conduct or activity that resulted in death or injury of the person was not done as a condition of membership to an organization.

§ 1006.63(1), (5), Fla. Stat. (2012).

As for the defendant's overbreadth claims, a "statute is deemed to be overbroad if it seeks to control or prevent activities properly subject to regulation by means which sweep too broadly into an area of constitutionally protected freedom." J.L.S. v. State, 947 So. 2d 641, 644 (Fla. 3d DCA 2007) (citing Firestone v. News–Press Publ'g Co., Inc., 538 So. 2d 457, 459 (Fla. 1989)). In J.L.S., the Third District set forth the following principles concerning the overbreadth doctrine:

> The doctrine of overbreadth permits an individual whose own speech or conduct may be prohibited to challenge an enactment facially "because it also threatens others not before the court—those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid." Sult v. State, 906 So. 2d 1013, 1019 (Fla. 2005) (quoting Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 503 (1985)). In other words, the issue of

5

overbreadth is one of the few exceptions to the traditional rules that courts will not consider factual questions beyond the scope of the case at hand. See Schmitt v. State, 590 So. 2d 404, 411–12 (Fla.1991). "Hypothetical consequences are considered in the case of allegedly overbroad statutes precisely because this is the only way to give effect to the constitutional right of free speech." Id. at 411.

The deleterious result of overbroad statutes often is described as a "chilling effect." . . . The overbreadth doctrine and its requirement of considering hypothetical consequences is intended to eliminate this chilling effect and thus allow for the free, unhindered exercise of constitutional rights.

Id. at 412 (citations omitted). It is said, however, that in the arena of free speech and expression, the overbreadth doctrine is an unusual remedy which is to be used sparingly, particularly where the challenged statute is primarily meant to regulate conduct and not merely pure speech. Id.

947 So. 2d at 644–45. Of consequence, "the overbreadth doctrine applies only if the legislation is susceptible of application to conduct protected by the First Amendment." Simmons v. State, 944 So. 2d 317, 323 (Fla. 2006) (quoting Southeast Fisheries Ass'n, Inc. v. Dep't of Nat. Res., 453 So. 2d 1351, 1353 (Fla. 1984)).

The defendant asserts that Florida's hazing statute encroaches upon constitutionally-protected speech or conduct and, thus, the statute is overbroad; however, he does not articulate how the statute is susceptible of application to speech or conduct protected by the First Amendment. See id.; State v. Bryant, 953 So. 2d 585, 587 (Fla. 1st DCA 2007). Rather, he simply argues that, by criminalizing hazing without respect to the victim's consent, subsection 1006.63(5) regulates and restricts "a wide variety of activity that would otherwise be protected by the First Amendment, including, most disturbingly, the freedom of association and expression." Because the defendant is challenging the statute on overbreadth grounds, he "bears the burden of demonstrating from both the text

6

of the statute and from actual facts that substantial overbreadth exists." J.L.S., 947 So. 2d at 645. The defendant has not demonstrated that the hazing statute criminalizes any speech or conduct protected by the First Amendment; therefore, his overbreadth challenge fails. See Kahles, 644 So. 2d at 512 (explaining that an overbreadth challenge fails if the enactment does not reach a substantial amount of speech or conduct protected by the First Amendment).

The defendant also argues that Florida's hazing statute is overbroad as applied to him. We disagree. To prevail on his as-applied challenge, the defendant must demonstrate that the hazing statute criminalized his own conduct, which was protected by the First Amendment. See State v. Cotton, 198 So. 3d 737, 743 (Fla. 2d DCA 2016). The defendant failed to sustain his burden of proof by not demonstrating how his conduct during the crossings was protected by the First Amendment. Additionally, he cites no authority supporting his overbreadth as-applied claim. See Newell v. State, 875 So. 2d 747, 748 (Fla. 2d DCA 2004) (rejecting constitutional challenge where defendant made only a generalized attack on the sexual offender registration statute, "without providing any significant analysis or citation to legal authority").

As for his claim of vagueness, the defendant argues that the words "brutality" and "competition," as set forth in the hazing statute, cause the statute to be unconstitutionally vague. Once again, we disagree.

"[T]he doctrines of overbreadth and vagueness are separate and distinct." Southeast Fisheries Ass'n, 453 So. 2d at 1353. "The vagueness doctrine has a broader application . . . because it was developed to assure compliance with the due process clause of the United States Constitution." Id. Our Supreme Court has explained:

7

A vague statute is one that fails to give adequate notice of what conduct is prohibited and which, because of its imprecision, may also invite arbitrary and discriminatory enforcement. In determining whether a statute is vague, common understanding and reason must be used. Where a statute does not specifically define words of common usage, such words must be given their plain and ordinary meaning. Further, courts cannot require the legislature to draft laws with such specificity that the intent and purpose of the law may be easily avoided. Courts must determine whether or not the party to whom the law applies has fair notice of what is prohibited and whether the law can be applied uniformly.

Id. at 1353–54 (citation omitted). Importantly, "[t]he Legislature's failure to define a critical term does not by itself render a statute unconstitutionally vague." Morton v. State, 988 So. 2d 698, 702 (Fla. 1st DCA 2008); accord State v. Hagan, 387 So. 2d 943, 945 (Fla. 1980). Instead, "[w]here a statute does not specifically define words of common usage, such words are construed in their plain and ordinary sense." Hagan, 387 So. 2d at 945; accord Morton, 988 So. 2d at 702. Furthermore, unlike overbreadth challenges, an individual challenging a statute as being unconstitutionally vague must satisfy the traditional rules of standing:

[T]he traditional rule is that a person to whom a statute may constitutionally be applied lacks standing to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the court.

J.L.S., 947 So. 2d at 646.

Here, the testimony presented at trial demonstrated that Champion, Hollis, and Sanchez were beaten repeatedly as each crossed Bus C. That conduct constituted brutality of a physical nature, plainly prohibited by the statute. Because the defendant participated in the crossings, he violated the plain terms of the statute. Thus, he lacks

8

standing to challenge the statute as being vague based on the term brutality.[4] See J.L.S., 947 So. 2d at 646 (concluding that defendant lacked standing to challenge school safety zone statute as being vague because he "engaged in some conduct clearly proscribed" by the statute).

Similarly, with respect to the term "competition," although the statute does not define this term or provide examples of competition, we may resort to dictionaries to determine the meaning of an undefined statutory term. See Morton, 988 So. 2d at 702; Sims v. State, 510 So. 2d 1045, 1047 (Fla. 1st DCA 1987). The World Book Dictionary defines competition as "the act or state of trying hard to win or gain something wanted by others." World Book Dictionary 423 (2009). Another dictionary contains the following similar definition of competition: "the act or action of seeking to gain what another is seeking to gain at the same time; . . . a common struggle for the same object." Webster's Third New International Dictionary 464 (1976). The meaning of "competition," as provided in these definitions, is sufficiently definite such that the defendant was not forced to guess at its meaning. See Morton, 988 So. 2d at 702 (relying on definition of "serious" found in two dictionaries in rejecting vagueness challenge based on undefined statutory phrase "serious bodily injury").

---

[4] Even if the defendant possessed standing to assert this challenge, the defendant's argument would still lack merit. As mentioned above, the statute provides a nonexclusive list of acts constituting "brutality," which includes "whipping," "beating," and "branding." §1006.63(1), Fla. Stat. (2012). These examples would put a person of ordinary intelligence on notice as to what conduct constitutes brutality. See Morton, 988 So. 2d at 702. Thus, the use of the term brutality does not render the statute unconstitutionally vague.

Having rejected all of the defendant's constitutional claims, we now discuss his claims of trial error.

The defendant argues that the trial court erred in denying his motion to dismiss the manslaughter count. We disagree.

"The standard of review for a trial court order regarding a motion to dismiss is de novo." Bell v. State, 835 So. 2d 392, 394 (Fla. 2d DCA 2003).

Prior to trial, the defendant moved to dismiss the manslaughter count, contending that the hazing statute is a specific statute covering a particular subject matter and, as such, was controlling over the general manslaughter statute, inclusive of that same subject matter. To support this claim, he relied on Adams v. Culver, 111 So. 2d 665, 667 (Fla. 1959) (recognizing that a specific statute covering certain subject matter controls over a general statute covering the same subject matter). The defendant acknowledged that subsection 1006.63(6) of the hazing statute expressly states that this "section shall not be construed to preclude prosecution for a more general offense resulting from the same criminal transaction or episode," but he argued that, because the sanctions under the more general offense of manslaughter are more severe than the sanctions of the specific offense of felony hazing, the Culver rule applied and, thus, warranted dismissal of the manslaughter count.

Here, the Legislature made clear in the language of subsection 1006.63(6) that the State can prosecute the defendant for "a more general offense resulting from the same criminal transaction or episode." Accordingly, the trial court properly denied the dismissal motion. See W. Fla. Reg'l Med. Ctr., Inc. v. See, 79 So. 3d 1, 9 (Fla. 2012) (explaining that, if a statute's language is "clear and unambiguous and conveys a clear and definite

10

meaning, this Court will apply that unequivocal meaning and not resort to the rules of statutory interpretation and construction."); Knowles v. Beverly Enterprises-Florida, Inc., 898 So. 2d 1, 10 (Fla. 2004) ("The rules of statutory construction are the means by which courts seek to determine legislative intent only when that intent is not plain and obvious enough to be conclusive.").

Next, the defendant argues that the trial court abused its discretion in admitting into evidence, over his objection, testimony and photographs relating to the condition of Champion's body after the bone harvest procedure was completed. He contends that the evidence was inadmissible because the State failed to establish the chain of custody of the body while it was transported to and from the bone harvesting location; and thus, the State failed to prove that Champion's body was not tampered with during the bone harvesting procedure. We disagree.

"A trial court's ruling on the admissibility of evidence is subject to an abuse of discretion standard of review, but the court's discretion is limited by rules of evidence and the applicable case law." Horowitz v. State, 189 So. 3d 800, 802 (Fla. 4th DCA 2015), approved, 191 So. 3d 429 (Fla. 2016). In State v. Jones, 30 So. 3d 619, 622 (Fla. 2d DCA 2010), the Second District explained the law applicable to claims of evidence tampering:

> [R]elevant physical evidence is admissible unless there is an indication of probable tampering. In seeking to exclude certain evidence, [the movant] bears the initial burden of demonstrating the probability of tampering. Once this burden has been met, the burden shifts to the proponent of the evidence to submit evidence that tampering did not occur.
>
> A mere break in the chain of custody is not in and of itself a basis for exclusion of physical evidence. Rather, the court should consider the probability that the evidence has been tampered with during the interim for which it is unaccounted.

Id. at 622 (alteration in original) (citations omitted) (internal quotation marks omitted).

11

The defendant presented no evidence, expert or otherwise, which demonstrated that Champion's torso received additional blunt trauma during the bone harvesting procedure or while in transit to and from that procedure. Thus, the defendant failed to sustain his burden of demonstrating probable tampering with Champion's torso. As such, the trial court did not err in permitting the State to submit evidence concerning the state of Champion's body after the bone harvesting was completed.

The defendant also argues that the trial court abused its discretion in admitting into evidence, over his objection, autopsy photographs. This argument lacks merit.

The Florida Supreme Court has observed:

> We have consistently held that the initial test for determining the admissibility of photographic evidence is relevance, not necessity. See Mansfield v. State, 758 So. 2d 636 (Fla. 2000). Photographs are admissible if "they assist the medical examiner in explaining to the jury the nature and manner in which the wounds were inflicted." Bush v. State, 461 So. 2d 936, 939 (Fla.1985). Moreover, photographs are admissible "to show the manner of death, location of wounds, and the identity of the victim." Larkins v. State, 655 So. 2d 95, 98 (Fla.1995). On the other hand, trial courts must be cautious in not permitting unduly prejudicial or particularly inflammatory photographs before the jury. However, a trial court's decision to admit photographic evidence will not be disturbed absent an abuse of discretion. See Mansfield, 758 So. 2d at 648.

> Further, "[t]he mere fact that photographs may be gruesome does not necessarily mean they are inadmissible. The admission of such photographs is within the trial court's discretion and will only be reversed when an abuse of discretion has been demonstrated." Harris [v. State, 843 So. 2d 856, 864 (Fla. 2003)] (citing Rose v. State, 787 So. 2d 786 (Fla. 2001)); see also Gorby v. State, 630 So. 2d 544, 547 (Fla.1993) (finding that trial court did not abuse its discretion in admitting numerous photographs and a videotape of the crime scene where "[t]he court conscientiously considered all of the photos the state sought to introduce and rejected those it found to be too prejudicial or cumulative"). To be relevant, however, "a photo of a deceased victim must be probative of

an issue that is in dispute." Almeida [v. State, 748 So. 2d 922, 929 (Fla. 1999)].

Ault v. State, 53 So. 3d 175, 198–99 (Fla. 2010); see also Armstrong v. State, 73 So. 3d 155, 168 (Fla. 2011); England v. State, 940 So. 2d 389, 399 (Fla. 2006).

Here, the defendant filed a motion in limine seeking to exclude the autopsy photographs, arguing that the photographs were not necessary to help the jury understand the medical examiner's testimony, were not relevant to the manslaughter or felony hazing charges, and were unduly prejudicial. The trial court denied the motion. At trial, the defendant renewed his motion in limine and additionally argued that the photographs would be unnecessarily gory. The motion was denied, and the photographs were admitted into evidence. This ruling was correct. See England, 940 So. 2d at 399; Ault, 53 So. 3d at 200.

Champion's autopsy photographs assisted the medical examiner in explaining to the jury the nature and manner in which the wounds were inflicted on his body. They also reinforced the testimony from other witnesses indicating that Champion had been repeatedly struck during the crossing. Importantly, the photographs were relevant to an issue that was in dispute: whether Champion was the victim of "any brutality of a physical nature, such as whipping, beating, branding . . . ." § 1006.63(1). Also, as for the claim that the photographs were not admissible because they were too gruesome, the trial court ruled that the photographs were not unnecessarily gory and independent review of the record supports this conclusion.

Next, the defendant argues that the trial court abused its discretion in refusing to issue his proposed jury instruction on uncharged conspiracy. This argument also lacks merit.

13

"The giving or withholding by a trial court of a requested jury instruction is reviewed under an abuse of discretion standard of review." Worley v. State, 848 So. 2d 491, 491 (Fla. 5th DCA 2003). "The trial court's refusal to give the requested instructions must be judged by [the appellate court] in light of all of the instructions actually given. If the instructions given contain a sufficient statement of the law concerning the points in controversy, then there is no reversible error in failing to give the requested instructions." Tolivert v. Estate of Scherer, 715 So. 2d 358, 359–60 (Fla. 5th DCA 1998).

At the charge conference, both the State and the defendant submitted proposed instructions to the trial court on the issue of uncharged conspiracy. After receiving argument on the proposed instructions, the trial court ruled that it would not use either instruction. Rather, the court drafted its own instruction on the issue.

In Boyd v. State, 389 So. 2d 642 (Fla. 2d DCA 1980), the Second District discussed the proper instruction to be issued on an uncharged count of conspiracy. The court explained:

> At a minimum, the instructions should contain a definition of conspiracy, an explanation of the legal consequences of proving a conspiracy in the case, and the admonition that it is for the jury to determine whether a conspiracy has been established beyond a reasonable doubt. Where, as in this case, the crime of conspiracy is not charged, the state is not required to prove all the elements of the crime of conspiracy and it is error to tell the jury it must find that all those elements have been established.

Id. at 647 (footnote omitted) (citations omitted). Here, the trial court's instruction defined conspiracy, explained the consequences of a conspiracy, and indicated that the jury must find that a conspiracy existed beyond a reasonable doubt. Because the court's instruction comported with Boyd, no error occurred.

14

The defendant next argues that the trial court erred in rejecting his proposed jury instruction on hazing. This argument was not preserved for appellate review because the record does not demonstrate that the defendant requested said instruction below. See Fla. R. Crim. P. 3.390(d); see also Hood v. State, 287 So. 2d 110, 110 (Fla. 4th DCA 1973) (explaining that a request for a jury instruction or an objection to the failure to give an instruction is necessary to raise error on appeal).

Lastly, the defendant argues that the trial court erred in denying his motion for mistrial. This argument also lacks merit.

During closing argument, the prosecutor stated, "[T]he problem is that the crossing has to stop." Defense counsel objected and sought a mistrial, claiming the comment constituted an inappropriate send-a-message argument. See Fletcher v. State, 168 So. 3d 186, 209 (Fla. 2015) (explaining that prosecutors may not ask the jury to send a message through its verdict). The trial court ultimately denied the mistrial motion, but promptly issued a curative instruction.

"The standard of review is . . . abuse of discretion where [the defendant] moved for a mistrial and [the] motion was denied." Panchoo v. State, 185 So. 3d 562, 564 (Fla. 5th DCA 2016) (citations omitted). "In determining whether improper remarks warrant a new trial, the remarks must be examined in 'the context of the closing argument as a whole and considered cumulatively within the context of the entire record.'" Jennings v. State, 124 So. 3d 257, 266 (Fla. 3d DCA 2013) (quoting McArthur v. State, 801 So. 2d 1037, 1040 (Fla. 5th DCA 2001)). Moreover, "[g]enerally speaking, the use of a curative instruction to dispel the prejudicial effect of an objectionable comment is sufficient." Id. (internal quotation marks omitted).

15

Here, while we agree that the prosecutor's comment was improper, the trial court issued a proper curative instruction. As such, the trial court did not err in denying the mistrial motion. See Espute v. State, 85 So. 3d 532, 536 (Fla. 4th DCA 2012) (holding that the trial court did not abuse its discretion in denying the defendant's motion for mistrial where the court sustained defense counsel's objection and gave a curative instruction).

AFFIRMED.


SAWAYA and COHEN, JJ., concur.