# Supreme Court of Florida

_____

No. SC17-200
_____

**DANTE MARTIN,**
Petitioner,

vs.

**STATE OF FLORIDA,**
Respondent.

December 13, 2018

CANADY, C.J.

For conduct committed in connection with the activities of the Florida A&M University's marching band, the Marching 100, Dante Martin was convicted of manslaughter, felony hazing resulting in death, and two counts of misdemeanor hazing. On appeal, the Fifth District Court of Appeal affirmed his convictions and sentences and rejected overbreadth and void-for-vagueness arguments Martin presented challenging the constitutionality of section 1006.63, Florida Statutes (2012), Florida's hazing statute. Martin sought review under article V, section 3(b)(3) of the Florida Constitution, based on the Fifth District's express declaration that the hazing statute is valid.

We granted jurisdiction, and we now consider Martin's various challenges to the constitutionality of the statute. Our analysis leads us to agree with the Fifth District's conclusion that Martin has presented no basis for declaring the hazing statute unconstitutional. We therefore approve the decision on review.

In explaining our decision, we begin with a review of the text of the hazing statute. We then briefly recount the facts regarding the episode involving the Marching 100 that was the basis for Martin's convictions. Next, we summarize the ruling of the district court rejecting Martin's arguments that the hazing statute is constitutionally invalid. Finally, we discuss the application of the relevant case law to Martin's overbreadth and void-for-vagueness claims regarding the hazing statute.

I.

The hazing statute, section 1006.63, contains both criminal and regulatory provisions. Subsection (1) provides a definition of hazing—including language specifically excluding from its coverage certain conduct—that is applicable to both the criminal and regulatory provisions. The specific criminal provisions are set forth in subsections (2)-(6), and the regulatory provisions are found in subsections (7)-(10). This case, of course, raises questions related to the criminal provisions. Of particular relevance here are the definition of hazing in subsection (1); the provisions of subsection (2) establishing the offense of third-degree felony hazing;

the provisions of subsection (3) establishing the offense of first-degree misdemeanor hazing; and the provision of subsection (5) providing that certain enumerated circumstances are not defenses to a charge of hazing.

The definition of hazing is, of course, critically important to determining the scope of criminal liability under the statute. An act is not punishable as a crime under the statute unless it falls within the ambit of that definition. But an act may come within the definition of hazing and still not be a criminal offense. The provisions establishing felony hazing and misdemeanor hazing both contain additional elements that go beyond the definition of hazing. An examination of those elements readily reveals that they substantially narrow the scope of criminal liability under the hazing statute.

> (1) As used in this section, "hazing" means *any action or situation* that *recklessly or intentionally endangers the mental or physical health or safety of a student* for purposes including, but not limited to, initiation or admission into or *affiliation with any organization operating under the sanction of a postsecondary institution.* "Hazing" includes, but is not limited to, pressuring or coercing the student into violating state or federal law, *any brutality of a physical nature, such as whipping, beating*, branding, exposure to the elements, forced consumption of any food, liquor, drug, or other substance, or other forced physical activity that could adversely affect the physical health or safety of the student, and also includes any activity that would subject the student to extreme mental stress, such as sleep deprivation, forced exclusion from social contact, forced conduct that could result in extreme embarrassment, or other forced activity that could adversely affect the mental health or dignity of the student. Hazing *does not include customary athletic events or other similar contests or competitions* or any activity or conduct that furthers a legal and legitimate objective.

§ 1006.63(1), Fla. Stat. (emphasis added).

The offense of felony hazing is established in subsection (2):

A person commits hazing, a third degree felony, punishable as provided in s. 775.082 or s. 775.083, when he or she *intentionally or recklessly commits any act of hazing* as defined in subsection (1) *upon another person who is a member of or an applicant* to any type of *student organization* and the hazing *results in serious bodily injury or death of such other person*.

§ 1006.63(2), Fla. Stat. (emphasis added).

Subsection (3) creates the offense of misdemeanor hazing:

A person commits hazing, a first degree misdemeanor, punishable as provided in s. 775.082 or s. 775.083, when he or she *intentionally or recklessly commits any act of hazing* as defined in subsection (1) *upon another person who is a member of or an applicant* to any type of *student organization* and the hazing *creates a substantial risk of physical injury or death to such other person*.

§ 1006.63(3), Fla. Stat. (emphasis added).

Subsection (5) contains a provision that negates certain potential defenses to

a hazing charge:

It is not a defense to a charge of hazing that:
(a) The *consent of the victim* had been obtained;
(b) The conduct or activity that resulted in the death or injury of a person was *not part of an official organizational event* or was *not otherwise sanctioned or approved by the organization*; or
(c) The conduct or activity that resulted in death or injury of the person was *not done as a condition of membership* to an organization.

§ 1006.63(5), Fla. Stat. (emphasis added).

As pertinent here, the definition of hazing extends to an "action or situation that recklessly or intentionally endangers the mental or physical health or safety of a student." § 1006.63(1), Fla. Stat. A significant strand in the definition of hazing expressly extends its coverage to "any brutality of a physical nature, such as whipping" or "beating." *Id.* "[C]ustomary athletic events or other similar contests or competitions" are expressly excluded from the definition of "hazing." *Id.*

The offenses of felony hazing and misdemeanor hazing both require that the offender "intentionally or recklessly commits an[] act of hazing." § 1006.63(2)-(3), Fla. Stat. And the two offenses both contain an additional element related to the consequence of the act of hazing. The felony offense requires that "the hazing results in serious bodily injury or death" of the victim. § 1006.63(2), Fla. Stat. For the misdemeanor offense to be established, the act of hazing must "create[] a substantial risk of physical injury or death" to the victim. § 1006.63(3), Fla. Stat.

Under subsection (5), the consensual participation of the victim in the event or situation that constitutes hazing is not a defense. § 1006.63(5)(a), Fla. Stat. Likewise, it is no defense that the hazing was not officially sanctioned or that it "was not done as a condition of membership." § 1006.63(5)(b)-(c), Fla. Stat.

## II.

On appeal from the judgment and sentences, the Fifth District set out the facts of the crimes:

[Martin] was a member of the percussion section of the Florida A & M University's marching band, the "Marching 100." Members of the percussion section are entitled to ride to away events in a motor coach known as "Bus C." [Martin] was president of Bus C.

A tradition or ritual known as "Crossing Bus C" has existed at the University for some time. The ritual consists of three components: 1) the hot seat, 2) the prepping, and 3) the crossing. During the hot seat, the participant takes a seat on Bus C (near the front) and is struck or hit repeatedly by others, including members of the percussion section. Next, the participant is prepped. During the prepping, the participant stands up and places his or her hands on the luggage rail and is then slapped a number of times with full force by the others on the bus. After the prepping, the participant crosses from the front of the bus to the back while others slap, kick, and punch the participant. [Martin], as bus president, decided when someone could cross Bus C.

On [November 19, 2011], Keon Hollis, Robert Champion, and [Martin], as members of the Marching 100, performed at the Florida Classic in Orlando, Florida. Immediately following the band's performance, [Martin] asked Hollis if he planned to cross the bus. Hollis indicated that he wanted to do so. Later, Jonathan Boyce, also a member of the band, received a text from [Martin] asking him to convey to Hollis and Champion that if they wanted to cross "it's available" to them.

That night, Lissette Sanchez (another member of the percussion section), Hollis, and Champion crossed Bus C, and [Martin] participated in these crossings. Champion was the last to cross. When Champion made it to the back, he appeared tired, but indicated, "I'm good." After the crossings were completed, everyone left the bus except Champion. When Boyce noticed that Champion was not with him, he returned to the bus. He found Champion in the back of the bus panicking; and, shortly thereafter, Champion passed out. Champion was taken to a hospital, but efforts to save his life were not successful.

Champion's body was transferred from the hospital to the medical examiner's office. Dr. Sarah Irrgang, the associate medical examiner, visually examined Champion's body. She observed some discoloration and a few superficial abrasions, she took several photographs, and then released Champion's body for bone harvesting. The next day, after his leg bones had been harvested, Champion's

body was returned to the medical examiner's office. At that time, Dr. Irrgang noticed unevenness in the skin on Champion's torso, suggesting swelling. This observation prompted Dr. Irrgang to investigate further. She took a number of pictures of Champion's body during the ensuing autopsy. Based on her investigation, she determined that the manner of death was homicide.

*Martin v. State*, 207 So. 3d 310, 313-14 (Fla. 5th DCA 2016).

III.

In evaluating Martin's overbreadth and vagueness challenges, the Fifth District began by acknowledging the analytical framework set forth by the Supreme Court in *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*[1]:

When addressing constitutional challenges to statutes based on the doctrines of overbreadth and vagueness,

[a] court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct. If it does not, then the overbreadth challenge must fail. The court should then examine the facial vagueness challenge and, assuming the enactment implicates no constitutionally protected conduct, should uphold the challenge only if the enactment is impermissibly vague in all of its applications. A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others. A court should therefore examine the complainant's conduct before analyzing other hypothetical applications of the law.

*State v. Kahles*, 644 So. 2d 512, 512-13 (Fla. 4th DCA 1994) (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S.

---

1. 455 U.S. 489 (1982).

489, 494-95, 102 S. Ct. 1186, 71 L.Ed.2d 362 (1982)), *approved*, 657 So. 2d 897 (Fla. 1995) (footnotes omitted).

*Martin*, 207 So. 3d at 314-15.

In line with this framework, the Fifth District first considered Martin's argument that the hazing statute is unconstitutionally overbroad on its face. The district court rejected Martin's argument on this point because Martin failed to make the necessary showing that the hazing statute "is susceptible of application to speech or conduct protected by the First Amendment." *Id.* at 316. According to the Fifth District, Martin "ha[d] not demonstrated that the hazing statute criminalizes any speech or conduct protected by the First Amendment" and "his overbreadth challenge [therefore] fails." *Id.* The court also rejected an as-applied overbreadth challenge, concluding that Martin had not shown "that the hazing statute criminalized his own conduct, which was protected by the First Amendment." *Id.*

After addressing the overbreadth challenges, the court turned to Martin's argument that the hazing statute is unconstitutionally vague. In brief, the district court ruled that Martin's conduct was "plainly prohibited by the statute," and that Martin therefore "lack[ed] standing to challenge the statute." *Id.* at 317. Specifically, the court rejected the argument that the reference in the statutory definition of hazing to "brutality of a physical nature" was vague. *Id.* The court reasoned that because the victims "were beaten repeatedly," the defendant's

- 8 -

participation in the episode violated the plain terms of the statute. *Id.* Similarly, the court rejected Martin's argument that the statutory exception for "competitions" was vague. In doing so, the court referred to certain dictionary definitions of "competition"—including the definition in *Webster's Third New International Dictionary* of competition as "a common struggle for the same object"—to show that the term "competition" "is sufficiently definite such that the defendant was not forced to guess at its meaning." *Id.* at 317-18.

## IV.

## A.

We first examine Martin's argument that the hazing statute is unconstitutionally overbroad on its face for criminalizing constitutionally protected speech and conduct. Martin bases this overbreadth argument specifically on the claim that subsection (5)(a) of the hazing statute—which provides that the victim's consent is not a defense—makes criminal a substantial amount of protected speech and conduct. Martin contends that the "statute's criminalization of voluntary acts in many circumstances chills commonplace and customary conduct." This argument fails to show that the criminal hazing statute meets the standard required for establishing that a statute is unconstitutionally overbroad.

Under the First Amendment facial overbreadth doctrine, "[l]itigants . . . are permitted to challenge a statute not because their own rights of free expression are

violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973). The Court has said that the "function" of "facial overbreadth adjudication" is "a limited one at the outset" and that it "attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from 'pure speech' toward conduct and that conduct—even if expressive—falls within the scope of otherwise valid criminal laws that reflect legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct." *Id.* at 615.

The Court thus has recognized that "[a]lthough such laws, if too broadly worded, may deter protected speech to some unknown extent, there comes a point where that effect—at best a prediction—cannot, with confidence, justify invalidating a statute on its face and so prohibiting a State from enforcing the statute against conduct that is admittedly within its power to proscribe." *Id.* The overbreadth doctrine therefore requires that "particularly where conduct and not merely speech is involved . . . the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Id.*; *see also United States v. Williams*, 553 U.S. 285, 292 (2008) ("According to our First Amendment overbreadth doctrine, a statute is facially invalid if it

prohibits a substantial amount of protected speech. . . . In order to maintain an appropriate balance, we have vigorously enforced the requirement that a statute's overbreadth be *substantial,* not only in an absolute sense, but also relative to the statute's plainly legitimate sweep."). "Application of the overbreadth doctrine . . . is, manifestly, strong medicine. It has been employed by the Court sparingly and only as a last resort." *Broadrick*, 413 U.S. at 613.

As pointed out in the earlier discussion of the text of the hazing statute, the criminal provisions of the statute require that "the hazing results in serious bodily injury or death" (for a felony offense) or that "the hazing creates a substantial risk of physical injury or death" (for a misdemeanor offense). § 1006.63(2)-(3), Fla. Stat. The focus of the criminal hazing statute thus undoubtedly is on physical harm and the risk of physical harm. Any impact on speech or expressive conduct is insubstantial and purely incidental to the purpose of preventing physical harm. Given the "plainly legitimate sweep" of the hazing statute, it cannot be said that the statute "prohibits a substantial amount of protected speech." The "strong medicine" of the overbreadth doctrine has no application in this context. Martin's overbreadth challenge fails.

### B.

We turn now to Martin's void-for-vagueness claims, in which he argues that the hazing statute is unconstitutionally vague not only as applied to him but also on

its face. His as-applied argument is based largely on the assertion that the term "competition" in the last sentence of the definition of hazing in subsection (1) "lacks precision." In brief, Martin contends that because "the bus crossing bore sufficient indicia of being a competition," the statute was unconstitutional as applied to him. Martin's argument that the statute is facially invalid relies more broadly on the last sentence of the definition of hazing. He contends that uncertainty in the interpretation of the terms contained in that sentence—which excludes certain categories of conduct from the scope of the definition of hazing— renders the statute void for vagueness in "its entirety." Martin has failed to establish that the statute is invalid either facially or as-applied.

It has long been recognized "[t]hat the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties" and that "a statute which either forbids or requires the doing of an act in terms so vague that [people] of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926). "A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.

Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

In discussing the standards governing facial vagueness challenges, the Court has previously said that a law is facially unconstitutional only if it "is impermissibly vague in all of its applications." *Hoffman Estates*, 455 U.S. at 495; *see also United States v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is[—outside the limited context of the First Amendment overbreadth doctrine—]the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."). But the Court more recently explained in *Johnson v. United States*, 135 S. Ct. 2551, 2560-61 (2015), that "although statements in some of [the Court's] opinions could be read to suggest otherwise, [the Court's] *holdings* squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." The Court this year reinforced the point in *Sessions v. Dimaya*, 138 S. Ct. 1204, 1214 n.3 (2018) ("*Johnson* made clear that our decisions 'squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp.' " (quoting *Johnson*, 135 S. Ct. at 2561)).

Thus a "shapeless," *Johnson*, 135 S. Ct. at 2560, "hopeless[ly] indetermina[te]," *id.* at 2558, statute that produces "grave uncertainty," *id.* at 2557,

- 13 -

regarding its scope will not survive a facial vagueness challenge even though "some conduct . . . clearly falls within the provision's grasp," *id.* at 2561.  *See Salman v. United States*, 137 S. Ct. 420, 428-29 (2016) (rejecting an as-applied vagueness challenge in part because the petitioner failed to demonstrate that the statute was "shapeless," plagued by "hopeless indeterminacy," or subject to "grave uncertainty" regarding its scope (quoting *Johnson*, 135 S. Ct. at 2557, 2558, 2560)).  Put another way, a statute that contains "no standard whatever by which criminality c[an] be ascertained . . . is vague 'not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all.' " *Parker v. Levy*, 417 U.S. 733, 755 (1974) (quoting *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971)); *see Smith v. Goguen*, 415 U.S. 566, 578 (1974) ("Such a provision simply has no core.").

To understand the proper scope of the void-for-vagueness doctrine, that doctrine must be viewed in conjunction with the rule of lenity.  In *Skilling v. United States*, 561 U.S. 358, 403 (2010), the Court—in rejecting a void-for-vagueness challenge—recognized that the "case law's current" requires courts if possible "to construe, not condemn, [legislative] enactments."  The Court there pointed generally to the well-established rule that "before striking a . . . statute as impermissibly vague" courts should "consider whether the prescription is

amenable to a limiting construction," *id.* at 405, and specifically to "the familiar principle that 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity,' " *id.* at 410 (quoting *Cleveland v. United States*, 531 U.S. 12, 25 (2000)). We have likewise applied the rule of lenity to resolve an ambiguity in the scope of a criminal statute rather than declaring the statute unconstitutionally vague. *See State v. Weeks*, 202 So. 3d 1, 4 (Fla. 2016) (rejecting void-for-vagueness challenge, applying the rule of lenity and stating that "by applying well-established principles of statutory construction, we conclude that we are able to construe the statute in a manner that avoids holding it unconstitutionally vague and does not effectively rewrite the statute"). Run-of-the-mill ambiguity regarding particular applications of a criminal statute therefore does not warrant application of the void-for-vagueness doctrine. *Cf. Dimaya*, 138 S. Ct. at 1232 (Gorsuch, J., concurring in part and concurring in judgment) ("The implacable fact is that this isn't your everyday ambiguous statute. It leaves the people to guess about what the law demands—and leaves judges to make it up. You cannot discern answers to any of the questions this law begets by resorting to the traditional canons of statutory interpretation.").

Here, at most, the various detailed arguments that Martin raises concerning the terms of the hazing statute do not point to anything that goes beyond run-of-the-mill ambiguity. And no actual ambiguity in the terms of the statute has been

identified by Martin that has any bearing on the offenses for which Martin was convicted. The conduct in which Martin was involved falls squarely and unambiguously within the statute's core proscription of "brutality of a physical nature, such as whipping" or "beating" that "intentionally or recklessly" "results in serious bodily injury or death" or "creates a substantial risk" of such harms. § 1006.63(1)-(3), Fla. Stat.

We categorically reject Martin's argument that section 1006.63(1) failed to place him on adequate notice that "Crossing Bus C" is not an exempt "competition[]" under the statute and failed to provide explicit standards of enforcement for the undefined term "competition[]." Martin's argument on this score is based on reading the term "competition[]" in isolation from its statutory context. The final sentence of the definition of hazing provides that hazing "does not include customary athletic events or other similar contests or competitions or any activity or conduct that furthers a legal and legitimate objective." § 1006.63(1), Fla. Stat. The most natural reading of this sentence requires understanding that the word "similar" modifies the terms "contests or competitions." *See id.*

This conclusion is bolstered by the fact that "customary athletic events" such as football, baseball, basketball, soccer, and hockey as well as track and field events are commonly referred to both as "contests" and "competitions." Indeed,

"competition" and "contest" are ordinarily understood to be synonymous. *See The American Heritage Dictionary* 376, 397 (5th ed. 2011) (defining the term "competition" as "a contest" and defining the term "contest" as "[a] competition, especially one in which entrants perform separately and are rated by judges"). This conclusion is further bolstered by the fact that in order to interpret the word "similar" as disjunctive to the term "competition[]," this Court would have to adopt the nonsensical view that a "customary athletic event[]" is not, in fact, a "competition[]." *See* § 1006.63(1), Fla. Stat.

Therefore, the relevant question is not whether the term "competition[]" is vague, but rather whether the term "similar . . . competition[]" is vague. It is not. The tradition or ritual known as "Crossing Bus C" is not a "similar . . . competition[]" to any "customary athletic event[]." *See id.* The crossing of Bus C simply does not comport with any commonly accepted understanding of a "competition[]" similar to a "customary athletic event[]": the person crossing is not competing against another person or group of persons, no one keeps score during the crossing because there is no system of scoring, the crossing is not timed, no prize is awarded after the crossing, no referee oversees the crossing (either to enforce rules or protect the life of the participant), and the participant "wins" the crossing by surviving a brutal beating. To the contrary, the crossing most closely

resembles the infamous military punishment known as the "running of the gauntlet."

V.

We approve the conclusion that Martin's challenges to the constitutionality of the hazing statute are without merit. We therefore approve the decision of the Fifth District affirming Martin's convictions and sentences.

It is so ordered.

QUINCE, POLSTON, LABARGA, and LAWSON, JJ., concur.
PARIENTE and LEWIS, JJ., concur in result.

ANY MOTION FOR REHEARING OR CLARIFICATION MUST BE FILED WITHIN SEVEN DAYS. A RESPONSE TO THE MOTION FOR REHEARING/CLARIFICATION MAY BE FILED WITHIN FIVE DAYS AFTER THE FILING OF THE MOTION FOR REHEARING/CLARIFICATION. NOT FINAL UNTIL THIS TIME PERIOD EXPIRES TO FILE A REHEARING/CLARIFICATION MOTION AND, IF FILED, DETERMINED.

Application for Review of the Decision of the District Court of Appeal – Statutory Validity

Fifth District - Case No. 5D15-284

(Orange County)

Rupak R. Shah of Escobar & Associates, P.A., Tampa, Florida,

for Petitioner

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, Wesley Heidt, Bureau Chief, Kristen L. Davenport and Bonnie Jean Parrish, Assistant Attorneys General, Daytona Beach, Florida,

for Respondent

Michael R. Ufferman of Michael Ufferman Law Firm, P.A., Tallahassee, Florida; and M. Stephen Turner of M. Stephen Turner, P.A., Tallahassee, Florida,

For Amicus Curiae Florida Association of Criminal Defense Lawyers

Arthur (Buddy) Jacobs of Jacobs Scholz & Associates LLC, Fernandina Beach, Florida,

for Amicus Curiae Professor Gregory S. Parks for HazingPrevention.org